# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**LORI SPELLMAN,**

   **Plaintiff,**

   **v.**

         **Case No. 2:15-CV-1115**
         **CHIEF JUDGE EDMUND A. SARGUS, JR.**
         **Magistrate Judge Elizabeth P. Deavers**

**OHIO DEPARTMENT OF**
**TRANSPORTATION, et al.,**

   **Defendants.**

## OPINION AND ORDER

Plaintiff Lori Spellman ("Spellman") brings this action against Defendant, the Ohio Department of Transportation ("ODOT"), alleging a hostile work environment for gender-based and sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* This matter is currently before the Court for consideration on Defendant's Motion for Summary Judgment. (ECF No. 24.) For the reasons that follow, Defendant's Motion is **GRANTED**.

## I. BACKGROUND

Plaintiff Lori Spellman began working for ODOT as a Highway Technician 1 in November 2009. (Complaint ("Compl.") ¶ 9, ECF No. 1.) Plaintiff alleges that she suffered gender-based and sexual harassment at the hands of her supervisor Robert Mock, her co-worker Jenny Sowers, and her manager Ray Dailey, among others, at ODOT. (*Id.* ¶¶ 11–54.) For reporting this harassment to her managers, Plaintiff claims that she was subjected to a "campaign of retaliation." (*Id.* ¶ 31.) As described more fully below, Mock, Sowers, and Dailey each eventually faced disciplinary action, transfer, or termination for their conduct.

## A. Transfer to Duncan Falls

Spellman was initially assigned to the Zanesville main garage in Muskingum County ("Muskingum County Garage") when she began her career at ODOT. (Deposition of Lori Spellman, Volume II ("Spellman Dep. Vol. II") at 256–57, ECF No. 19.) Spellman testified it was well known at ODOT that she was gay because on her first day at the Muskingum garage, Vikki Sharrock announced to everyone in the common area, "So Muskingum County has a new lesbian resident . . . everybody knows what happened to the last lesbian that tried to work here."[1] (Spellman Dep. Vol. 1 at 64, ECF No. 18.)

In November 2011, former County Manager Ray Dailey transferred Ms. Spellman to the Duncan Falls outpost. Ms. Spellman resisted the transfer, however, because a particular employee there, Bob Mock, had a reputation for disliking gay people and women who worked in traditionally male roles. (Spellman Dep. Vol. II at 284.) Mark Meyers, who briefly served as the transportation manager at Duncan Falls, described Bob Mock as "old school"—meaning he believed that a man's place is to work and a women's place is to stay home, and also did not accept the gay lifestyle. (Deposition of Mark Meyers ("Meyers Dep.") at 28–29, ECF No. 31.)

Ms. Spellman states that she was harassed from day one at Duncan Falls. (Spellman Dep. Vol. 1 at 98.) Initially, Spellman's direct manager was Mark Meyers, who reported to Ray Dailey, the county manager. Her co-workers included Bob Mock, Brian Dunlap, Tim Mahon, Don Miller, Rob Lohrman, Josh McCormick, Alan Dickson, and Jenny Sowers. (*Id.* at 91–92, 95.) When Spellman and Mock were out fixing a guardrail on one of her first days, Mock kept asking her whether she knew the lady who owned the nearby house, stating that "she's like you" in a malicious manner. (*Id.* at 99–100.) When Spellman asked Mock what he meant, he

---

[1] This statement by Sharrock predates the allegations that were the focus of the relevant EEO investigation, which only addressed the alleged conduct beginning in November 2011. Thus, this statement and will be only considered for purposes of context for the proceeding allegations.

answered, "Well, she plays softball." (*Id.*) Spellman took his statement as an inference meaning

lesbian, and replied: "I'm sorry, I don't know her, and there are no gay Yellow Pages that I know

of in Zanesville." Mark Meyers also believed the comment was a reference to gay women.

(Meyers Dep. at 17.) A few days later, Spellman went to Ray Dailey and asked if she could be

transferred back to Muskingum County, but Dailey told her to "stick it out." (*Id.* at 158.)

According to Spellman's testimony, other incidents that occurred during this time at Duncan

Falls, such as:

- Bob Mock regularly ignored Ms. Spellman and her safety advice and warnings, including when a tree was about to fall on a coworker, but that Mock was receptive to communication from her male co-workers. (Spellman Dep. Vol. II at 299.)

- Mock said Spellman's partner was responsible for his son killing himself because he bought drugs at the bar where her partner worked. (Spellman Dep. Vol. I at 183–84.)

- Mock would demean Ms. Spellman and criticize her work with a chainsaw in front of her co-workers. (Spellman Dep. Vol. II at 303–04.)

- When Mock was promoted to Crew Leader, he made it clear that "he was the male, and the males were in charge." (*Id.* at 310.)

- At a previous office holiday party, Jenny Sowers made comments to several men that Ms. Spellman "doesn't want what you got between your legs . . . she wants what I got between mine," which Spellman avers that Dailey overheard. (*Id.* at 321–22.)

- Spellman believed that Mock assigned her flagging duties because he thought women could only perform certain tasks. (Spellman Dep. Vol. 1 at 167–68.)

- Mock complimented other women in the office on their appearance, which Spellman perceived as criticism for not dressing as effeminately. (*Id.* at 146.)

- After raising concerns about the cleanliness of the bathroom, Spellman's co-workers referred to her as the "bathroom bitch." (Spellman Dep. Vol. III at 538.)

- Spellman states that Mock ordered her to cut a tree within the right of away, against ODOT regulation, and threatened to report her if she did not obey. Spellman replied that she would cut the tree if he ordered a male coworker to do the same. (Spellman Dep. Vol. II at 245.)

During this time period, Spellman avers that the harassment was so bad that she was throwing up on the way to work. (Spellman Dep. Vol. I at 112). Spellman reported these incidents to her manager Ray Dailey, as well as to Mark Meyers, Rex Prouty, and Brian Dunlap. (*Id.* at 127, 171–72).

### B. January 5, 2012 Incident

On January 5, 2012, the crew was out on a job when Ms. Spellman requested to use the restroom multiple times. At the time, Spellman was suffering from kidney stones, which caused her pain and trouble with urination. (*Id.* at 112.) As crew leader, Mock permitted Ms. Spellman to use the restroom the first time, but when Spellman radioed Jenny Sowers (who was the middle person for the radio) for permission to use the restroom again, she replied that "Bob said you're just going to have to wait." (*Id.* at 117.)

When the crew returned to the breakroom, Mock confronted Spellman and asked if she had a medical condition that caused her to urinate so frequently. (*Id.* at 119.) Spellman responded that Bob was not allowed to ask her a question like that. (*Id.*) Mock demanded that she answer in front of the rest of the crew. He continued to scream at her, saying that she was going to learn her place and that she needed to "grow some muscles and learn to pee in the woods like everybody else." (*Id.* at 120.) He also made a comment to the effect that his 80-year-old father could hold

4

his bladder longer than she could. (*Id.* at 122.) Spellman testified that she was very scared during his tirade because she believed that Mock had previously assaulted other coworkers. (*Id.*) Spellman eventually stated to Mock: "permission to pee, Bob?" to which he made some comment that she was learning her place. (*Id.* at 121.) Other crew members also recall the incident in a similar manner. (*See e.g.* Deposition of Joshua McCormick ("McCormick Dep.") at 24–32, ECF No. 30.)

Spellman testified that from that time on, she was afraid to ask permission to use the restroom, and instead would hide herself behind a truck door when she had to go to the bathroom. (Spellman Dep. Vol. I at 126.) Josh McCormick further recalls that Mock would order the entire crew to stop working and shut down the job when Spellman had to use the restroom because "if she didn't have to work, they didn't have to work." (*Id.* at 119, 129–30; McCormick Dep. at 24, 26.) Mark Meyers testified that if a job was properly staffed, there would be no need to shut down a job just because someone had to use the bathroom. (Deposition of Mark Meyers ("Meyers Dep".) at 31–32, ECF No. 31.)

Spellman reported the incident to Rex Prouty shortly thereafter, who then confronted Mock about it in the breakroom. Mock repeated his comments, which caused Spellman to start crying. She asked to take the rest of the day off, but was told to go back and do her work. (Spellman Dep. Vol. I at 125, Vol. II at 352.) Prouty reported the incident to Ray Dailey, and the next day, January 6, 2012, Spellman met with Prouty and Dailey. At the meeting, Spellman read a prepared statement summarizing her concerns with Mock and the rest of the crew. (Ex. 2 to Spellman Dep. Vol. I at 31, ECF No. 18-1.) Spellman primarily addressed her safety concerns, but ended with, "I should not have to tolerate outright harassing, demeaning, inflammatory and slanderous comments toward myself, especially in front of my coworkers." (*Id.* at 32.)

The following Monday, January 9, 2012, Mock apologized to Spellman saying, "God didn't make me perfect and neither did you . . . When we leave here out of this office today, I want us all to get along." (Spellman Dep. Vol. I at 86–87.) Mock tried to shake hands but Spellman refused. (*Id.*) That same day, Spellman asked Rex and Dailey if she could talk to Colleen Ryan, the Labor Relations Officer for ODOT District 5. (Spellman Dep. Vol. II at 371.) Spellman testified that Dailey told her he would report her concerns to Ryan, but insinuated that Spellman would look bad if she continued to pursue the matter, noting that she had an impeccable reputation and had never filed an EEO complaint. (*Id.* at 398.) Three days later on January 12, Spellman happened to run into Colleen Ryan at a county meeting and approached her about her concerns. (*Id.* at 407–413.) To Spellman, it was clear Colleen Ryan had not been contacted by Dailey and was hearing about her concerns for the first time.

### C. EEO Investigation and First Administrative Leave

Although Spellman indicated that she did not want a formal investigation by the Department's Equal Opportunity Office ("EEO"), Colleen Ryan initiated an investigation as required. (Deposition of Kimberly Watson ("Watson Dep.") at 20–21, ECF No. 21; Ex. 1 to Watson Affidavit ("Watson Aff."), ECF No. 24-1.) Bob Mock was subsequently transferred to the Moxahala Outpost on January 30, 2012 pending the outcome of the EEO investigation. (Ex. 2 to Watson Aff.) Spellman claims that after speaking to Colleen Ryan on January 12, the crew began to ostracize her and make harassing and snide comments. Specifically, Jenny Sowers would comment about how much she missed Bob Mock any time Spellman entered the room, taking any chance she could to "needle" or mock Spellman (*Id.*)

The investigation was first assigned to EEO Investigator Shelba Bradley on or around January 23, 2012. (Watson Dep. at 20–21.) Accordingly to Kim Watson, Bradley's supervisor,

the initial investigation Bradley performed was deficient. (*Id.* at 29.) After Bradley issued her

formal report on March 23, 2012, concluding that the situation did not amount to a hostile work

environment, Kim Watson rescinded the report and initiated a new investigation. Watson

interviewed additional employees and issued a second report on May 3, 2012. (Ex. 2 to Watson

Aff.) In her report, Watson concluded that Ray Dailey should have reported Spellman's

allegations from the January 6 meeting, and despite his claims that he called Colleen Ryan, there

was no evidence of any such phone call. (*Id.*) She further found that Bob Mock had violated

ODOT policy by asking Spellman if she had a medical condition, and also that Jenny Sowers

engaged in behavior that could be perceived as harassment. (*Id.*) However, Watson also

concluded that there was no probable cause to determine that Mock created a hostile work

environment for Spellman based on her sex or perceived disability.

Leading up to and during the investigation, Spellman began to take vacation and personal

days to avoid the harassment. (*Id.* at 522.) She also reported losing a lot of weight and throwing

up on her way to work from the stress of the situation. (Spellman Dep. Vol. I at 112; Watson

Dep. at 51.) After discussing her dwindling leave balances with Kim Watson, Watson suggested

that she take disability leave. Spellman rejected this option, however, because she wouldn't

receive her full pay on disability leave. (Spellman Dep. Vol. III at 523–24.) Watson therefore

decided to place Spellman on administrative leave with full pay beginning on April 9, 2012. The

letter to Spellman notifying her of the action stated: "Given the events of the last several days,

we want to stress that this action is not a reflection on you." (Ex. 3 to Watson Aff.) Spellman

remained on administrative leave until June 14, 2012. During this time period, Spellman was

required to call in and report that she was ready to work every day, but otherwise was paid her

full salary. (Spellman Dep. Vol. III at 526.) Spellman was only required to come in once for

random alcohol testing. (Ex. 3 to Affidavit of John Tornes ("Tornes Aff."), ECF No. 24-2.)

Before the EEO investigation was complete, Jenny Sowers was terminated on March 31, 2012. (*Id.*) Bob Mock was disciplined on June 22, 2012 with a five-day suspension for failure to follow ODOT policy when he asked Spellman about her medical status. (Ex. 5 to Watson Aff.) Finally, on August 23, 2012 Ray Dailey was notified that he would be demoted, but he elected to retire before the demotion would take place. (Watson Dep. at 23–24.)

### D. Second Administrative Leave and Independent Medical Exam

After returning from administrative leave on June 14, 2012, Spellman was transferred back to her previous post at the Muskingum County garage. However, Spellman alleges that the pattern of harassment from her coworkers resumed. (Spellman Dep. Vol. III at 534.) Specifically Spellman testified that Ray Dailey, Don Miller, Tim Mahon, Vicki Sharrock, Bob Lemmon, and Phil Valentine all contributed to what she deemed a hostile work environment. (*Id.* at 535.) Josh McCormick agreed that the crew treated Spellman disrespectfully or ignored her during this time period. (*Id.* at 64–65.) For instance, Don Miller would carry around a notebook, which he called the "cover my ass" notebook, as a reference to Spellman having reported Mock. (Spellman Dep. Vol. III at 539.) Also, in August 2012, Ray Dailey stayed an entire day at the garage and "hyper-monitored" Ms. Spellman and put his hand over her hand when she tried to start a chainsaw. (*Id.* at 551.)

Shortly thereafter, Phil Valentine replaced Dailey as the Transportation Administration for Muskingum County. (Deposition of Phil Valentine ("Valentine Dep.") at 11, ECF No. 22.) Valentine testified that there was a lot of unrest in the garage during this time and a lack of trust between Spellman and her coworkers. (*Id.* at 13.) Spellman was called for a random drug testing on September 20, 2012, at which she became so upset that she was unable to receive her

assignment for the day. (*Id.* at 16.) Valentine recalls that Spellman appeared distracted, reserved, and uncharacteristic of her typical demeanor. (*Id.* at 13, 22, 24.) After attending a mandatory EEO training on how to identify workplace violence, Valentine not only believed that Spellman exhibited several of the traits referenced in the training, but testified that several other transportation managers came to him sharing the same concerns. (*Id.* at 18–19.)

After Valentine reported his concerns to Colleen Ryan, a meeting was held at the ODOT central office in late summer/early fall of 2012 to discuss whether Spellman should be placed on a second administrative leave and sent for psychological examination (or "IME" for independent medical exam). (Watson Dep. at 55.) Watson asserts that Joe Rutherford, former deputy director of District Five, requested the meeting. (*Id.*) In attendance at the meeting were Phil Valentine, Mike Cope (Assistant Director over Business and Human Resources), Joe Rutherford, Nick Nicholson, (former deputy director of HR), Patrick Piccininni (chief legal counsel for ODOT), Mike Bussa (HR Manager), and Kim Watson. (*Id.* at 54–55.) During the meeting, Joe Rutherford apparently expressed his concern that Spellman had lost an excessive amount of weight, exhibited paranoia, and gave people the middle finger as they left the Muskingum County Garage. (*Id.* at 56.)

Kim Watson testified that she did not believe there was sufficient evidence to support the need for Spellman to be placed on administrative leave or undergo an IME because Spellman was still able to perform her job. (*Id.* at 57.) Watson sent an email to the chief legal counsel expressing her concern that placing Spellman on administrative leave again so soon could potentially draw a retaliation claim. (*Id.* at 94.) Nevertheless, it was decided that Spellman would be placed on administrative leave again and evaluated to determine whether she was fit for duty. Watson believed that Joe Rutherford was the driving force behind this decision. (*Id.* at 59.)

Spellman was placed on administrative leave on September 24, 2012 and on October 17, 2012

underwent a psychological examination and was found fit for duty. (Plaintiff's Response to Def

Mot. at 25, ECF No. 33; Compl. ¶ 50, 53.)

Upon returning to work, Spellman notes that she continued to feel ostracized and

isolated. She asserts that on January 9 and 10 of 2012, she requested time off because her

partner's mother had passed away unexpectedly, as other employees had always been afforded

bereavement leave in similar situations, but was told that if she did not report for overtime that

evening she would be redlined. (Spellman Dep. Vol. III at 576.)

### E. Procedural History

On April 9, 2012, Spellman filed a formal complaint with the Ohio Civil Rights

Commission. (Compl. ¶ 41.) The Equal Opportunity Commission mailed Spellman a Dismissal

and Notice of Suit Rights on December 30, 2014. (*Id.* ¶ 7.) Spellman filed this action on March

27, 2015, against ODOT and three individually named Defendants for violations of Title VII and

other state law claims. Defendants filed a motion to dismiss all of Spellman's claims against the

individually named defendants and the state law claims against ODOT. (ECF No. 7 at 5.). The

Court granted Defendant's motion and dismissed all claims, leaving intact the Title VII claims

against ODOT. Specifically remaining before the Court are Spellman's claims that her

supervisor and other co-workers at ODOT (1) discriminated against her on the basis of gender

and sexual orientation, (2) created a hostile work environment and (2) engaged in retaliatory

action. Defendant now moves for summary judgment as to all claims.

### II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotations omitted). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; s*ee also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

## III. ANALYSIS

### A. Hostile Work Environment

Spellman alleges that ODOT failed to appropriately respond to her complaints of sexual

11

harassment, which amounted to a hostile work environment in violation of Title VII. It is well established that "Title VII offers employees protection from a 'workplace [ ] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . .'" *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To establish a prima facie case for a hostile-work-environment claim under Title VII, a plaintiff must show that (1) she was a member of a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir. 1999).

"To establish that the harm was 'based on her sex,' [a plaintiff] 'must show that but for the fact of her sex, she would not have been the object of harassment.'" *Farra v. Gen. Motors Corp.*, 163 F. Supp.2d 894, 906 (S.D. Ohio 2001) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999)). Notably, the United States Court of Appeals for the Sixth Circuit recognizes that "harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement." *Williams*, 187 F.3d at 565; *see also Ladd*, 552 F.3d at 500 ("[S]exual animus can be inferred from conduct not overtly sexual in nature when the context suggests it.").

To be actionable, a plaintiff must establish that the harassment in question "had the effect of unreasonably interfering with her work performance and created an objectively intimidating, hostile, or offensive work environment." *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874,

878 (6th Cir. 2013). In other terms, the conduct in question "must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Id.*; *see also Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (explaining that "'severe or pervasive' is properly considered in the disjunctive"). When determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment, the Court must look to the "totality of the circumstances" relating to the workplace environment. *Williams*, 187 F.3d at 562; *cf. Austion v. City of Clarksville*, 244 F. App'x 639, 649 (6th Cir. 2007) (holding that, within the hostile work environment context, the Court may look to "a series of separate acts that collectively constitute" discrimination, even if "some of the component acts of the hostile work environment fall outside the statutory time period"). Courts may consider a number of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris*, 510 U.S. at 23.

The inquiry relating to the seriousness of the harassment "is not subject to any precise mathematical test." *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 324 (6th Cir. 2010). On the one hand, Title VII is not a "code of workplace civility" and "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to a hostile work environment." *Rayford v. Illinois Cent. R.R.*, 489 F. App'x 1, 5 (6th Cir. 2012) (internal quotations omitted). At the same time, gender based comments and remarks will weigh in favor of a pervasiveness finding when they are "commonplace, ongoing, and continual" in nature. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998); *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 337 (6th Cir. 2008) ("[A] serial harasser left free to harass

13

again leaves the impression that acts of harassment are tolerated at the workplace . . . .").

Importantly, sex-based conduct and comments "need not be directed at a plaintiff in order to

constitute conduct violating Title VII," although courts generally consider actions specifically

directed at a plaintiff to be more severe. *Abeita,* 159 F.3d at 251 (internal quotations omitted); *cf.*

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 273 (6th Cir. 2009) (stressing that

although conduct was not directed at the plaintiff, due to the work setting, it was impossible for

the plaintiff to avoid the offensive conduct).

1. Protected Class

As a threshold matter, Spellman asserts that she is a member of a protected class on the

basis of sex, both with respect to her gender and sexual orientation. ODOT does not dispute that

sex is a protected class, but asserts that the Sixth Circuit has long maintained that Title VII does

not prohibit discrimination on the basis of sexual orientation. *See, e.g.*, *Vickers v. Fairfield Med.*

*Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006).

The EEOC recently ruled that discrimination on the basis of sexual orientation is

discrimination on the basis of sex under Title VII. *See Baldwin v. Dep't of Transportation*,

EEOC Appeal No. 12013080, 2015 WL 4397641, at *1 (July 15, 2015); (Ex. A to Pl. Resp., ECF

No. 33-1.) In *Baldwin*, the EEOC concluded that sexual orientation "is inherently a 'sex-based

consideration,' and an allegation of discrimination based on sexual orientation is necessarily an

allegation of sex discrimination under Title VII." *Id.* at *5. The EEOC explained:

> "Sexual orientation" as a concept cannot be defined or understood without
> reference to sex. A man is referred to as "gay" if he is physically and/or
> emotionally attracted to other men. A woman is referred to as "lesbian" if she is
> physically and/or emotionally attracted to other women. . . . It follows, then, that
> sexual orientation is inseparable from and inescapably linked to sex and,
> therefore, that allegations of sexual orientation discrimination involve sex-based
> considerations.

14

*Id.* Moreover, the Supreme Court has recognized a viable Title VII claim on the basis of sex stereotyping or gender-non-conforming behavior. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989) ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."). The Sixth Circuit has also made clear that although sexual orientation is not an explicitly protected class, Title VII nevertheless protects a homosexual or transgender plaintiff from harassment for failure to conform to traditional sex stereotypes, for instance by expressing less feminine mannerisms and appearance. *See, e.g., Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004); *Myers v. Cuyahoga Cty.*, 182 Fed. App'x 510, 519 (6th Cir. 2006).

ODOT argues that the EEOC's recent decision in *Baldwin* does not disturb binding circuit precedent that has declined to recognize sexual orientation as a protected class, citing *Hively v. Ivy Tech Cmty. Coll.*, 830 F.3d 698 (7th Cir. 2016) in support. In *Hively*, the Seventh Circuit determined that its case law "has been unequivocal in holding that Title VII does not redress sexual orientation discrimination," and was thus bound to it despite the recent EEOC ruling to the contrary. However, since ODOT filed its motion for summary judgment, *Hively* has been vacated pending a rehearing en banc. *See Hively v. Ivy Tech Cmty. Coll.*, 2016 WL 6768628 (No. 15–1720).

This Court finds the case *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) to be relevant and especially persuasive in the context of a sexual harassment claim. In *Oncale*, a male employee brought a claim under Title VII alleging sexual harassment by his male coworkers. The Fifth Circuit below had denied his claim, holding that same-sex sexual harassment claims are never cognizable under Title VII. Justice Scalia delivered the opinion of the Court, and in reversing the Fifth Circuit's decision held that "sexual harassment must extent

to sexual harassment of any kind that meets the statutory requirements." *Id.* at 80. Title VII prohibits discrimination "because of . . . sex" without regard to the sex of the harasser. 42 U.S.C. § 2000e-2(a)(1). Justice Scalia explained that discrimination is usually easiest to infer in the male-female context because "the challenged conduct typically involves explicit or implicit proposals of sexual activity" and "it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id.* However, same-sex discrimination might also be found "for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by a general hostility to the presence of women in the workplace." *Id.* Thus, the Supreme Court has recognized that Title VII prohibits "sexual harassment" of any kind if it is "because of . . . sex."

Spellman alleges that the statements and conduct of her ODOT coworkers were harassment "because of . . . sex" because they concerned her sexual orientation or gender non-conforming behavior. Spellman alleges that Bob Mock repeatedly asked Spellman if she knew a particular woman because "she's like you" because "she plays softball." (Spellman Dep. Vol. I at 99–100.) Bob Mock would also compliment other women on how they looked in front of Spellman, which she perceived as criticism of her appearance because she wore baggy clothes, wore no makeup, and had shorter hair—in other words, failed to conform to traditional sex stereotypes. (Spellman Dep. Vol. I at 146–48.) Additionally, Jenny Sowers made several offensive comments about Spellman concerning her sex. (Spellman Dep. Vol. II at 321–22 (commenting to several men that Ms. Spellman "doesn't want what you got between your legs . . . she wants what I got between mine").) It is reasonable to infer that these comments would not have been made to someone of the opposite sex. Thus, Spellman may assert a claim of sexual

harassment on the basis of her gender or sexual orientation here because she offers evidence that she was harassed by both men and women "because of" her sex.

2. Employer Liability

Even if the conduct Spellman complains of amounts to harassing behavior based on sex, ODOT is nevertheless entitled to summary judgment on the final employer liability prong of the claim. "[E]mployers are not automatically liable for sexual harassment perpetrated by their employees." *Rayford*, 489 F. App'x at 5 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)). "Once a hostile work environment is established, an employee alleging sexual harassment by a coworker must still establish that the employer is liable because it knew or should have known of the harassment, yet failed to take prompt and appropriate corrective action." *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008) (citing *E.E.O.C. v. Harbert–Yeargin, Inc.,* 266 F.3d 498, 518 (6th Cir. 2001)). "[A] company may be held liable for coworker harassment if its 'response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.' " *Id.* (quoting *Blankenship v. Parke Care Ctrs., Inc.,* 123 F.3d 868, 873 (6th Cir. 1997)). "[A] response is generally adequate ... if it is 'reasonably calculated to end the harassment.' " *Id.* at 340 (quoting *Jackson v. Quanex Corp.,* 191 F.3d 647, 663–64 (6th Cir.1999)). And whether a response is effective is "measured not by the extent to which the employer disciplines or punishes the alleged harasser, but rather if the steps taken by the defendant halt the harassment." *Stacy v. Shoney's, Inc.,* 955 F. Supp. 751, 756 (E.D. Ky. 1997), *aff'd* 142 F.3d 436 (6th Cir.1998).

Thus, the act of discrimination by the employer "is not the harassment, but rather the inappropriate response to the charges of harassment." *McCombs v. Meijer, Inc.,* 395 F.3d 346, 353 (6th Cir. 2005). Accordingly, the relevant inquiry here is whether ODOT's conduct, after

having been put on notice of Mock's and other employees'[2] actions toward Spellman, constituted appropriate remedial action. This is because, as the Sixth Circuit has stated in discussing hostile work environment claims, "when the allegations of sexual harassment involve a coworker and the employer has fashioned a response, the employer will only be liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Id.*

With this standard in mind, the Court finds that ODOT acted appropriately and promptly in response to Spellman's complaints of harassment. Spellman was transferred to Duncan Falls in November of 2011, after which she began to make various complaints regarding safety and Bob Mock's behavior to her supervisor Ray Dailey. The incident and confrontation with Bob Mock regarding Spellman's use of the bathroom took place on January 5, 2012, which she reported to Dailey and had a formal meeting with Dailey and Mock the next day. Although Dailey failed to report the incident to his supervisors, Spellman spoke with Labor Relations Officer Colleen Ryan within the same week. In response, Ryan promptly initiated an EEO investigation as required. As a result of the two EEO investigations conducted, Bob Mock was transferred and received a five-day suspension, Jenny Sowers was immediately terminated, and Ray Dailey elected to retire before he could be disciplined for his failure to report Spellman's complaints. Although Spellman was placed on administrative leave to remedy her dwindling leave balances, she received full pay and was transferred back to her requested post as the Muskingum garage. The record indicates that she remains employed at ODOT. There is no

---

[2] Contrary to Spellman's allegation that Mock was a supervisor, the record indicates that Mock was only a "team leader" which allowed him assign work duties for the day, but did not empower him to take any tangible employment actions such as hiring, firing, or failing to promote. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013). Thus, Mock will be considered a co-worker for purposes of this analysis. Regardless, the Court notes that Mock received a five-day suspension for his conduct towards the plaintiff.

18

genuine issue of material fact as to whether ODOT took prompt and appropriate steps. Accordingly, ODOT is entitled to summary judgment on the hostile work environment claim.

### B. Sex Discrimination

Spellman also alleges that her ODOT coworkers discriminated against her on the basis of her gender and sexual orientation by making inappropriate, offensive, and unwelcome remarks of a sexual nature to her in the workplace. ODOT argues that Spellman cannot establish a prima facie case of discrimination because she did not suffer adverse employment action. The Court agrees.

To establish an employment discrimination claim under Title VII or Ohio law, "a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003) (citation omitted); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196 (1981). Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Absent direct evidence, a plaintiff may withstand summary judgment by presenting sufficient circumstantial evidence from which a reasonable jury could infer a discriminatory or retaliatory motive. In such cases, the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), applies. Under that paradigm a plaintiff must first present a prima facie case of discrimination. If a plaintiff meets the prima facie requirements, the burden then shifts to the defendant to offer a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 893. Once a defendant offers such a reason, the burden returns to plaintiff to demonstrate that the defendant's proffered

reason is a pretext for discrimination. *Id.*

To establish a prima facie case of discrimination based on circumstantial evidence, Spellman must show by a preponderance of the evidence that: (1) she is a member of a protected group, (2) she was subjected to an adverse employment decision, (3) she was qualified for the position, and (4) that she was replaced by a person outside the protected class or a similarly-situated individual was treated more favorably. *Serrano v. Cintas Corp.*, 699 F.3d 884, 892–93 (6th Cir. 2012).

Defendant does not dispute that Spellman is a member of a protected class on the basis of sex or that she was qualified for the position. However, Defendant argues that Spellman cannot show that she suffered adverse employment action when she was placed on paid administrative leave twice, was sent for random drug and alcohol testing, and was ordered to undergo an independent medical evaluation ("IME"). (Defendant's Motion for Summary Judgment ("Def. Mot.") at 20, ECF No. 24.)

The United States Court of Appeals for the Sixth Circuit has provided the following guidance in assessing adverse employment action in a discrimination claim:

> An adverse employment action has been defined as "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc) (citation omitted). A "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not sufficient to constitute an adverse employment action. *Id.* at 797. Adverse employment actions are typically marked by a "significant change in employment status," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

*Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010). Moreover, "[t]he Sixth Circuit has consistently held that de minimus employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). Specifically,

Sixth Circuit case law suggests that temporary removal or forced administrative leave with pay are not, in and of themselves, materially adverse employment actions. *See e.g.*, *Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir. 1999) (police chief's suspension with pay was not adverse employment action); *Bowman*, 220 F.3d at 461–62 (temporary removal without reduction in salary did not amount to tangible employment action under Title VII sex discrimination claim); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (holding that an employee's placement on paid administrative leave pending the outcome of an investigation is not an adverse employment action); *see also Jones v. Southeastern Pennsylvania Transp. Auth.*, 796 F.3d 323, 324 (3d Cir. 2015) (nearly three-month suspension with pay pending investigation of alleged wrongdoing was not adverse action); *Hunter v. District of Columbia*, 905 F. Supp. 2d 364 (D.D.C. 2012) (paid ten-day suspension and forced fitness for duty examination was not adverse employment action).

The Court agrees that Spellman's alleged harm does not rise to the level of an adverse employment action for purposes of her discrimination claim. Although Spellman was placed on paid administrative leave twice, given two random drug tests, and evaluated for fitness for duty, none of these actions amount to a material adverse consequence affecting the terms or conditions of her employment. To start, Spellman presents no evidence indicating that the drug tests were not random or outside the normal terms of her employment. Additionally, Defendant notes that the first administrative leave was intended to address Spellman's concerns about her dwindling leave balances and not wanting to take reduced pay under disability leave. Kim Watson testified that placing Spellman on administrative leave was meant to help conserve her remaining leave and that the action was not disciplinary. (Ex. 3 to Watson Aff.)

Spellman next argues that the stigma of the forced psychological evaluation and the

months-long leave should be considered more than de minimis. (Plaintiff's Response to Def. Mot. ("Pl. Resp.") at 26, ECF No. 33.) She further asserts that "on two occasions, ODOT took away from Ms. Spellman, the biggest source of pride and achievement in her life: her work with ODOT." (*Id.* at 26–27.) Nevertheless, neither the administrative leaves nor the IME caused any change to Ms. Spellman's employment status or benefits (she remains employed by ODOT), a loss in pay, or a change in benefits or responsibilities. Because Spellman has not demonstrated that she suffered a material adverse employment action, she cannot establish a prima facie case of sex discrimination under Title VII and her claim therefore fails.

### C. Retaliation

In addition to her hostile work environment and discrimination claim, Spellman maintains that Defendant retaliated against her in violation of Title VII based on her complaints of discrimination and EEO activity. Plaintiff primarily bases her retaliation claim on her second administrative leave and forced psychological evaluation after returning to work from her previous administrative leave. To establish a prima facie case of Title VII retaliation, a plaintiff must show that:

> (1) [she] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Once a plaintiff establishes a prima facie case, the employer must offer a legitimate, nondiscriminatory reason for the adverse action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). If the employer meets this requirement, the plaintiff must then show that the proffered reason is actually a pretext for unlawful retaliation. *Id.*

Drawing all justifiable inferences in Spellman's favor, the Court finds that she has presented sufficient evidence to establish a prima facie case for retaliation, but that her claim nevertheless fails because she has failed to show that the proffered reason for placing her on a second administrative leave and IME was pretext for unlawful retaliation. The parties here do not dispute that Spellman engaged in activity protected by Title VII when she complained to Ray Dailey and Colleen Ryan about Bob Mock's behavior, nor that her protected activity was known to ODOT. In dispute, however, is whether ODOT thereafter took adverse employment against Spellman and whether the protected activity was causally related to the adverse employment action.

Although Spellman failed to establish adverse employment action on her discrimination claim, the Court finds that here she presents sufficient evidence to meet the relatively low bar for adverse action in her retaliation claim. A plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). The Supreme Court has held that an adverse employment action within the retaliation context is one that might dissuade a reasonable employee "from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006) (noting that a supervisor's failure to invite an employee to lunch could, under certain circumstances, amount to materially adverse retaliation action).

Analogous here is *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007), in which the Sixth Circuit had significant doubt about whether the plaintiff suffered adverse action in her discrimination claim, but found the same action to be sufficient in the retaliation context. *Id.* ("The retaliatory actions alleged by Michael, including her brief

placement on paid administrative leave and the 90–day performance plan, appear to meet this relatively low bar."). Here, Kim Watson described Spellman's two administrative leaves and forced psychological evaluation as "traumatic," though later clarified that she at least felt they were "significant." (Watson Dep. at 98.) The Court therefore finds that Spellman has met her burden of showing adverse employment action for her retaliation claim.

With respect to the fourth element, to demonstrate a causal connection, a plaintiff "must produce sufficient evidence from which an inference can be drawn that he would not have been fired had he not engaged in the protected activity." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009). The Sixth Circuit has acknowledged that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). More specifically, "previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months." *Id.* at 524, n.3 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir.2000)). Otherwise, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

Here, Spellman was placed on administrative leave close enough in time to her protected activity to establish a causal connection. Spellman initially spoke to Colleen Ryan in January 2012, at which point the EEO investigation was initiated and ultimately completed in May 2012. Spellman was placed on her first administrative leave from April to June of that year, and

24

subsequently put on a second administrative leave and sent for psychological evaluation in September 2012. Even if temporal proximity alone was not sufficient a causal connection, Spellman provides further evidence in support. Spellman alleges that when she returned from her first administrative leave, she was put exclusively on mow trim duty and further ostracized by her coworkers. (Spellman Dep. Vol. III at 590.) For instance, Don Miller would carry around a notebook, which he called the "cover my ass" notebook, as a reference to Spellman having reported Mock. (*Id.* at 539.) Kim Watson also testified that she did not believe there was sufficient evidence to support the need for the second administrative leave and psychological evaluation, and even surmised that placing Spellman on administrative leave again so soon could be perceived as retaliation. (Watson Dep. at 57.) Thus, a jury could reasonably infer a causal connection between the adverse action and Spellman's protected activity.

Despite Spellman having established a prima facie retaliation claim, ODOT has nevertheless met its burden of articulating a legitimate non-retaliatory reason for placing Spellman on administrative leave and sending her for evaluation. Phil Valentine described Spellman's behavior after returning from her first administrative leave as distracted, reserved, and uncharacteristic of her typical demeanor. (Valentine Dep. at 13, 22, 24.) Moreover, he and other coworkers believed that Spellman exhibited several of the traits identified at a recent training for workplace violence. These concerns, combined with observations that Spellman had lost an excessive amount of weight, was paranoid, and was flicking people off as they left the Muskingum County Garage, led ODOT to place Spellman on a second administrative leave and have her evaluated for fitness of duty.

Because the Defendant has offered a legitimate nonretaliatory reason for placing Spellman on her second administrative leave and having her evaluated, the burden shifts back to

25

Plaintiff, who must demonstrate the Defendant's explanations for the adverse action was pretext for retaliation. "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (internal quotations omitted). "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional [retaliation]." *Id.* (internal quotations omitted).

Here, Spellman fails to offer any tangible evidence showing that ODOT's decision to place her on administrative leave a second time or sending her for evaluation was pretext for retaliation. She contends that Defendant lacked any real evidence to support the actions it took against her. Although Spellman alleges that Rutherford was the driving force behind placing her on administrative leave, she offers no evidence to show that he was motivated in some way by Spellman's EEO activity. She simply states that "the 'vague' nature of Mr. Rutherford's basis for such a serious endeavor calls into question ODOT's true motivations." (Pl. Resp. at 37.) Contrary to these assertions, the Court finds ODOT's proffered reasons for placing Spellman on administrative leave sufficiently articulated and reasonable.

The only other possible motive the Court can infer from the record is a meeting in which Joe Rutherford asked Spellman and her coworkers about ways to improve productivity. (Spellman Dep. Vol. II at 133–34, 199–200.) After asking whether she could speak without fear of reprisal, Spellman suggested that employees could begin following proper safety guidelines and specifically named Ray Dailey and other transportation managers as individuals who had not followed ODOT guidelines in the past. (*Id.*) While one could possibly infer that Rutherford resented Spellman for criticizing her coworkers, there is no evidence to suggest any connection

to her protected activity as the basis for his recommending her second administrative leave. Ultimately, without more detailed evidence relating to ODOT's underlying motivations, a jury could not reasonably infer that retaliatory animus motivated ODOT's actions.

Thus, Spellman has failed to raise an issue of fact showing that ODOT's proffered reason was actually a pretext for unlawful retaliation. Even when viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the Court concludes that no reasonable jury could find in her favor on her retaliation claim.

### D.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 24) is **GRANTED**.

**IT IS SO ORDERED.**

_3-22-2017_
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**